694 A.2d 529

**Philip N. POSTELLE**

v.

**Peter McWHITE.**

**No. 1593, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

June 3, 1997.

Douglas R. Taylor, Rockville, for Appellant.

Thomas J. Sippel (Janet Levis Tomko and Gill & Sippel, on the brief), Rockville, for Appellee.

Argued before MURPHY, C.J., and WENNER and DAVIS, JJ.

DAVIS, Judge.

Philip N. Postelle appeals from a judgment of the Circuit Court for Montgomery County entered on July 23, 1996, following a jury verdict for compensatory and punitive damages for wrongful eviction and conversion. On May 24, 1995, appellee Peter McWhite brought an action against appellant and AMCI Corporation. As to Count I of the suit, a claim against AMCI only, the court stayed the claim when AMCI declared bankruptcy. Appellee's claim also raises Counts II and III against appellant Postelle for his alleged wrongful eviction and conversion of appellee's property. At the conclusion of the trial, appellant stipulated liability with respect to both the counts of wrongful eviction and conversion, and the court directed a verdict as to liability in favor of appellee. Appellant also stipulated to compensatory damages in the amount of $1,807.50 for attorney's fees incurred by appellee in obtaining an injunction. The jury returned a verdict for compensatory and punitive damages totaling $19,972.20, including the stipulated attorney's fees. Appellant filed a motion for a new trial, and the court denied the motion on August 19, 1996. On August 21, 1996, appellant noted a timely appeal, and presents the following issues for our review which we restate below:

I. Whether the trial court erred when it denied appellant's motion to dismiss based on appellee's failure to establish monetary losses.

II. Whether there was sufficient evidence of actual malice to support an award of punitive damages.

## FACTS

Appellee is a self-employed consultant. Appellant is the president and sole stockholder of Automation Management Consultants Incorporated (AMCI). The parties have known each other for about twenty years. In June 1990, AMCI leased one of its offices to appellee for $250 a month plus the costs of an additional telephone line. On August 15, 1990, the parties entered into an Agreement For Consulting Services under which appellee was to be paid $82.50 an hour for his work on a contract AMCI secured with the federal government.

Difficulties between appellee and AMCI developed when AMCI failed to provide appellee with timely payments for his work. In July 1994, AMCI owed appellee $22,275 for consulting services. Appellee asked appellant when payment could be expected and appellant told appellee that he would be paid when AMCI received payment from the government. Appellee discovered that the government had in fact paid appellant, and when the parties met again, appellee confronted appellant with this information. The meeting, however, did not result in payment by appellant, and therefore, appellee's lawyer composed a letter to appellant which appellee hand delivered on July 12, 1994.

The letter put appellant on notice that a lawsuit would be filed if the money that was due and owing was not paid. Subsequent to the delivery of the letter, the parties met. Appellee described appellant as "agitated." Appellant told appellee that "the lawsuit was a waste of time, that he knew how to jerk around the chains of lawyers, and that it was going to cause [appellee] more in legal fees than [he] could ever expect to get from the lawsuit, and [appellant] had been through this before."

On July 27, 1994, appellee filed a suit against AMCI to recover the $22,275 that AMCI owed him. The next day, July 28, 1994, Vincent Moralia served appellant, as resident agent for AMCI, with an original lawsuit for breach of contract. Moralia described the circumstances that led to service as

"like in the movies." Moralia went to AMCI's offices and located appellant. When appellant saw Moralia walking towards him with papers, he ran around a table, pulling chairs behind him, and ran out the door. Moralia chased appellant, who headed for the stairwell and ran down three or four flights of stairs, followed by Moralia. Appellant then went back up the stairs to the sixth floor where he was confronted by Moralia, who served him with the summons and complaint. Appellant went into his office with the papers, slammed the door, and three seconds later, appellant opened his office door and threw the papers out of his office.

At the time appellant was being served, appellee was in his office. When appellee heard appellant slam his door, he came into the hallway and encountered appellant. Appellant told appellee to leave the office and that he was no longer welcome. Appellee left the office for approximately an hour, and when he returned, he discovered that a lock had been placed on his office door.

On July 28, 1994, appellee's attorney faxed appellant a letter advising appellant that he would be liable for locking appellee out of his office in retaliation for the complaint that he filed against AMCI for money that it owed to appellee. Appellee's attorney explained that appellee will suffer serious financial consequences and irreparable harm if he continues to be denied access to his office which contains his business materials and computer. The letter also informed appellant that, due to his conduct, appellee was unable to work on a contract for which he was being paid $640 per day. Finally, the letter stated that if appellant did not allow appellee access to his office, appellee would seek injunctive relief on July 29, 1994. Appellant testified that he never received this letter.

Subsequently, appellant arranged a meeting with appellee, but no agreement was reached and appellant did not allow appellee to return to his office. At the meeting, appellee reiterated to appellant that he was supposed to be working on another contract at a rate of $660 a day, but he was unable to

work because the materials he needed were locked in his office.

On July 29, 1994, appellee's attorney sent appellant a letter notifying him that appellee would be seeking *ex parte* injunctive relief from the court on August 1, 1994 for locking appellee out of his office on July 28, 1994. On August 1, 1994, the Circuit Court for Montgomery County issued an *ex parte* injunction enjoining AMCI and its agents from interfering with appellee's access to his office.

Appellee gained access to his office on August 2, 1994. On August 4, 1994, appellee moved his equipment to a new office, and alleged that it took him approximately ten working days to set up the new office. Appellee testified that he ceased working on the contract with AMCI before he was locked out of his office, and as of July 28, 1994, he was working with Human Resources Research Incorporated. Appellee claims to have lost twelve to fourteen days of work at a rate of $640–$660 per day as a result of being locked out of his office. Appellee also testified that he suffered damages because he was unable to do marketing, and he incurred additional expenses when he had to relocate his office. At trial, the parties stipulated to damages in the amount of $1,807.50 for legal fees incurred in obtaining the injunction.

Appellee was paid $22,275 for his work, which was the subject of the first suit, after obtaining a default judgment against AMCI and attaching one of the corporate bank accounts to satisfy the judgment. This appeal arises from the second suit filed against AMCI and appellant. As we noted, the count in the second suit relating to AMCI was stayed when AMCI filed for bankruptcy. As for the counts relating to appellant, the court entered a directed verdict against appellant as to liability for wrongful eviction and conversion pursuant to appellant's stipulation, and the jury returned a verdict for compensatory and punitive damages in the amount of $19,972.20.

## DISCUSSION

Appellant argues that the trial court erred when it denied his motion to dismiss appellee's claim because the evidence was insufficient to support a jury's finding of compensatory damages. In addition, appellant contends that appellee failed to establish actual malice, and therefore, the court should not have submitted the issue of punitive damages to the jury. Viewing the evidence in a light most favorable to appellee, we conclude that the trial court properly submitted the issues of compensatory and punitive damages to the jury.

### I

■ Appellant stipulated liability with regard to wrongful eviction and conversion, and the court entered a directed verdict on liability. At the conclusion of plaintiff's case and at the conclusion of trial, appellant moved the court to dismiss the claim with respect to compensatory damages because, he argued, the evidence was insufficient to establish damages.[1] The trial court, viewing the evidence and all reasonable inferences in the light most favorable to appellee, denied both of

---

1. In *Jenkins v. Karlton*, 329 Md. 510, 515 n. 2, 620 A.2d 894 (1993), the Court of Appeals stated that the motion to dismiss filed by the defendant at the conclusion of plaintiff's case, "[a]lthough characterized as a motion to dismiss, in truth, it was a motion for judgment pursuant to MD. RULE 2–519." Similarly, in the instant case, appellant characterized his motion at the conclusion of the plaintiff's case and at the conclusion of trial as a motion to dismiss, when, in truth, it was a motion for judgment, pursuant to MD. RULE 2–519.

According to MD. RULE 2–322 and relevant case law, when a defendant files a motion to dismiss, the trial court determines, based on the pleadings and all inferences which can be reasonably drawn from those pleadings, whether the complaint states a claim for which relief can be granted. *See Baker, Watts & Co. v. Miles & Stockbridge*, 95 Md.App. 145, 186, 620 A.2d 356 (1993). In the instant case, the court took evidence, thereby looking beyond the pleadings, and viewed the evidence and inferences in the light most favorable to the appellee in accordance with MD. RULE 2–519(b). Appellant did not request the court to treat the motion as a motion for summary judgment. Furthermore, the record does not support a conclusion that the court treated the motion as a motion for summary judgment, pursuant to MD. RULE 2–322(c).

appellant's motions, and at the conclusion of the case, submitted the issue of damages to the jury. *See Schreiber v. Cherry Hill Const. Co.*, 105 Md.App. 462, 493, 660 A.2d 970, *cert. denied, Cherry Hill Constr. v. Schreiber,* 340 Md. 500, 667 A.2d 341 (1995) and *Metromedia Co. v. WCBM Maryland Inc.*, 327 Md. 514, 518, 610 A.2d 791 (1992); *see also* MD. RULE 2–519(b) (1997). The jury returned a verdict for compensatory damages with respect to the count for wrongful eviction, in the amount of $391.65 for moving costs and $3,520 for lost income opportunity. As for the conversion count, the jury returned a verdict for compensatory damages for lost income opportunity in the amount of $3,520 and $1,650.70 for loss of use.

We conclude that the evidence was sufficient to support an award of compensatory damages, and the trial court properly submitted the issue to the jury. Appellant contends that appellee has not established compensatory damages other than those stipulated to, and he asserts that appellee suffered no other monetary loss. Appellant highlights the fact that appellee was paid in full for the one contract he was working on, at a rate of $640–$660 a day, when he was locked out of his office. In addition, the evidence that appellee suffered loss when he was denied the opportunity to do marketing, appellant asserts, is too speculative for the jury because it is not measurable. Finally, appellant argues that the moving expenses appellee incurred should not have been submitted to the jury because these costs would have been incurred no matter when appellee's tenancy ended.

In an action for conversion of personal property, a plaintiff is entitled to "the fair market value of the property at the time of conversion, with legal interest thereon to the date of the verdict." *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 415, 494 A.2d 200 (1985). When, however, the value of the property detained is the same upon its return, as in the case *sub judice,* damages are measured by the loss of use of the property. *Id.* at 416, 494 A.2d 200. In *Keys,* the Court of Appeals held that the trial court erred when it granted

appellees' motion for judgment on the count of conversion. The Court explained that

[a]lthough Appellant offered no evidence of the damage she suffered from the loss of use of these wages, the jury could have found at least the loss of interest thereon, and Appellant would have been entitled to a jury instruction informing the jury of the legal rate of interest prevailing at the time of the wrong. With that information, the jury properly could have calculated an award of damages.

*Id.* Similarly, damages are recoverable in wrongful eviction cases. In *Stevan v. Brown,* 54 Md.App. 235, 242–3, 458 A.2d 466 (1983) (quoting *Weighley v. Muller,* 51 Pa.Super. 125 (1912)), we declared that if a "tenant was evicted by the landlord or by acts equivalent to an eviction was deprived of his pecuniary interest under the lease, he was entitled to recover as damages the loss suffered by him...."

In the instant case, we hold that the trial court did not err when it denied appellant's motion for judgment, and it properly submitted the issue of damages to the jury. Viewing the evidence in the light most favorable to appellee, the facts indicate that appellee was prevented from using his office, business materials, and computer equipment for a period of twelve to fourteen days; at the time appellee was denied access to his office, he was working on a contract at a rate of $640–$660 a day; as a result of being locked out of his office, appellee did not meet the completion date on this contract. Appellee also experienced difficulty in communicating with his clients because his phone line was disconnected by appellant. Relying on this evidence, a jury could properly find that appellee suffered damages as a result of the conversion and wrongful eviction.

■ Appellant argues that, because appellee was eventually able to complete his contract and was paid in full for his services, he has not suffered any pecuniary loss as a result of the twelve to fourteen day lock-out. In addition, appellant argues that appellee would have eventually had to move and would have been caused to incur moving expenses then.

Damages, however, may be awarded for the loss of earnings, unforeseen expenses, mental suffering, and damage to reputation. *See Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 618, 471 A.2d 735 (1984). Appellee lost twelve to fourteen working days at a rate of $640–$660 a day. Even though he was eventually able to complete his contract and receive payment, the jury could reasonably conclude that these facts do not negate the evidence that those twelve to fourteen work days were days of lost earnings and damage to his reputation.

In addition, the jury could conclude that appellee's move was a sudden and unforeseen expense, and thus, he was entitled to damages. Viewing the evidence in the light most favorable to appellee, the trial court properly concluded that there was sufficient evidence from which a jury could reasonably find that plaintiff was entitled to compensatory damages for loss of use of his property, loss of income opportunity, and moving expenses. Furthermore, the jury's verdict on compensatory damages is a modest sum, far less than the amount of days lost multiplied by appellee's rate of pay per day, and appropriately based on appellee's testimony of his loss of use of his office and property.

## II

The jury also awarded punitive damages to appellee in the amount of $9,082.35 for wrongful eviction. Appellant raises the issue of whether there was sufficient evidence of malice to support an award of punitive damages. We hold that there was sufficient evidence upon which a reasonable jury could find that appellant acted with malice when he wrongfully evicted appellee from his office. Punitive damages are recoverable when the defendant's conduct is without legal justification or excuse "but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Schaefer v. Miller*, 322 Md. 297, 300, 587 A.2d 491 (1991) (citing *H & R Block, Inc. v. Testerman, et ux*, 275 Md. 36, 43, 338 A.2d 48 (1975)).

Since *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md. 556, 69 A. 405 (1908), Maryland has recognized that a plaintiff may recover exemplary or punitive damages for tortious conduct arising out of a contract when the jury finds "that the defendant acted maliciously ... with a wanton disregard of all the plaintiff's rights...." *Id.* at 568–69, 69 A. 405. The Court explained that if

> there was evidence tending to show that the defendant had caused the contract to be broken for the sole purpose, and with the deliberate intention of wrongfully injuring the plaintiff, exemplary damages might be recovered, but when the object was merely to benefit itself, although the plaintiff would be thereby injured, there would be no more reason for allowing such damages than there would be in a suit by one party to a contract against the other for breach of it.

*Id.* at 569–70, 69 A. 405.

The cases following *Knickerbocker* applied its holding and required evidence of actual malice to recover punitive damages. In *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 460, 601 A.2d 633 (1992), the Court opined that in order to recover punitive damages arising from nonintentional torts, it is insufficient to establish only gross negligence or implied malice. *Id.*[2] Instead, the Court held that a plaintiff must present evidence of actual malice. *Id.* The Court defined actual malice as conduct characteristic of an intent to injure, evil motive, ill will, or fraud. *Id.* In *Adams v. Coates*, 331 Md. 1, 626 A.2d 36 (1993), the Court extended the standard for punitive damages set forth in *Zenobia* to any award of punitive damages, even those based on intentional torts. *See also Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 227–28, 652 A.2d 1117 (1995); *Komornik v. Sparks*, 331 Md. 720, 724–25, 629 A.2d 721 (1993). In order to insure that punitive damages are properly awarded, the Court in *Zenobia* held that a

---

**2.** The Court in *Zenobia* overruled *H & R Block v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975) and *Wedeman v. City Chevrolet*, 278 Md. 524, 366 A.2d 7 (1976). Both of those cases held that when a contract is involved the standard for punitive damages differs depending on whether the tort occurs before or after the contract.

plaintiff must establish actual malice by clear and convincing evidence. *Zenobia,* 325 Md. at 469, 601 A.2d 633; *see also U.S. Gypsum Co. v. Baltimore,* 336 Md. 145, 188, 647 A.2d 405 (1994).

Establishing actual malice in a commercial setting is particularly difficult because of the inherently competitive and aggressive nature of the business environment and the necessity to discern that conduct is motivated by malice rather than the result of a legitimate commercial controversy. Such an environment makes it difficult for courts to determine when "behavior that is an integral part of commercial competition, should be considered 'wrongful'...." *See Alexander & Alexander v. B. Dixon Evander & Assoc.,* 336 Md. 635, 653, 650 A.2d 260 (1994) ("Participants in the economic marketplace are expected to act aggressively in seeking business and furthering their own position in the market."); *see also Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293, 307 (Utah 1982) ("In the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage."). For example, in *K & K Management, Inc. v. Lee,* 316 Md. 137, 557 A.2d 965 (1989), the appellant challenged a punitive damage award with respect to appellee's conversion claim. *Id.* at 174, 557 A.2d 965. The Court reiterated that "[i]n a tort action arising out of contract, punitive damages are recoverable only where the plaintiff establishes actual malice." *Id.* at 175, 557 A.2d 965. K & K Management, owners of a motel restaurant, reacquired possession of its property from the operators of the motel restaurant, Chul Woo and So Ja Lee. *Id.* at 141, 557 A.2d 965.

K & K Management resorted to self-help in order to repossess the premises, which the Court stated "is not a prohibited means of acquiring repossession of premises upon termination of a commercial lease, so long as the repossession can be effected peacefully." *Id.* at 178, 557 A.2d 965. Although the method used to repossess the property was peaceful and not per se illegal, the repossession was not authorized because there was no breach of the lease. *Id.* The Court held that more than a breach of contract is needed to establish

an inference of actual malice. *Id.* The Court concluded, given the basis for re-entry and lack of prohibition against peaceful self-help, that the "re-entry without notice after the restaurant closed for business was entirely compatible with a desire to avoid a confrontation possibly leading to violence." *Id.* at 179, 557 A.2d 965. K & K Management's motive in repossessing the property was self interest, and was not done with ill will or the intent to injure, and therefore, the Lees were not entitled to punitive damages. *Id.*

In *Siegman v. Equitable Trust Co.*, 267 Md. 309, 297 A.2d 758 (1972), the Siegmans filed an action for conversion and wrongful dishonor of their checks. *Id.* at 311, 297 A.2d 758. The Court held that in order for the Siegmans to establish actual malice, they were required to show that the acts of conversion and wrongful dishonor were accompanied by conduct that manifests actual malice. *Id.* at 316, 297 A.2d 758. The evidence indicated that the bank mistakenly attempted to satisfy, out of a joint checking account, the individual debt of Mr. Siegman created by his endorsement on a forged check. *Id.* Because of the bank's carelessness, the Siegmans were entitled to compensatory damages, but the Court held that "[t]here is no evidence that the bank either converted his funds or refused to honor his checks out of evil motives intended to injure the Siegmans ... the bank was motivated by self interest rather than by a malicious desire to harm the appellants." *Id.*

Plaintiffs have been able to establish actual malice in the commercial arena, when the evidence supports the inference that the defendant's motive in breaching a contract or committing the tortious act was not self interest, but rather that the defendant was motivated by a desire to harm the plaintiff. For example, in *Henderson v. Maryland Nat'l Bank*, 278 Md. 514, 366 A.2d 1 (1976), the plaintiff filed a suit against the bank for breach of contract, conversion, and slander when a "series of bank blunders" eventuated in the bank wrongfully repossessing plaintiff's car. *Id.* at 518, 366 A.2d 1. The bank stipulated that it was guilty of conversion without legal justification, but argued that the plaintiff was not entitled to puni-

tive damages. *Id.* at 520, 366 A.2d 1. The Court explained that it is "the motive for repossession that becomes determinative of the question whether there was actual malice here." *Id.* The Court concluded from the evidence that "an inference arose that the employee, provoked at appellant's angry refusal to bring the records [evidencing payment] from Alexandria to College Park, repossessed the car to force production of the records or, far worse to punish him for his refusal." *Id.* at 523, 366 A.2d 1. This, the Court held, was sufficient to take to the issue of actual malice to the jury. *Id.*

The Court in *Henderson* also explained that proof of actual malice may be established by either direct proof, such as "utterances reflecting personal animosity," or inferred from acts and circumstantial evidence. The Court pointed out that "[i]n the commercial sphere, at least, where an impersonal relationship is more likely to prevail, such emotions as anger or spite are not always vented in a direct manner, and not infrequently find their expression in the facts and circumstances surrounding the tortious conduct." *Id.* at 520, 366 A.2d 1.

Another case in which the plaintiff was able to establish sufficient evidence of actual malice from tortious conduct arising out of a contract is *McClung–Logan Equipment Co. v. Thomas,* 226 Md. 136, 172 A.2d 494 (1961). In *McClung–Logan,* a seller of tractors wrongfully seized a tractor from a buyer who continuously complained to the seller about the tractor's performance. *Id.* at 139–41, 172 A.2d 494. The Court upheld the award of punitive damages, finding that the evidence gave rise to a reasonable inference that the seller became provoked with the buyer's numerous requests to correct the defective tractor and, in order to put a stop to the complaints, seized the tractor and forced appellee to sign a release of all claims that he might have against the seller. *Id.* at 149, 172 A.2d 494. The Court concluded that appellant's wrongful seizure and wrongful detention of appellee's tractor could be found by the jury to be actual malice. *Id.; see Lake Shore Investors v. Rite Aid Corp.,* 55 Md.App. 171, 181, 461 A.2d 725 (1983), *aff'd Rite Aid Corp. v. Lake Shore Investors,*

298 Md. 611, 471 A.2d 735 (1984) (there was sufficient evidence of actual malice when the defendant intentionally interfered in plaintiff's contractual relationship with another party, threatened plaintiff with litigation, posed ultimata to the other party, and vowed "to fix" the plaintiff); *see also Fraidin v. Weitzman*, 93 Md.App. 168, 202–03, 611 A.2d 1046 (1992) (sufficient evidence that appellant purposely interfered with a contract in order to injure appellee).

The instant case quite clearly illustrates actual malice in a commercial setting, as defined by the Court, through both direct and circumstantial evidence. Viewing the evidence in the light most favorable to appellee, the evidence indicates that appellant was irritated when he learned that appellee was suing him for breach of contract and, as a retaliatory measure minutes after appellant was served, he told appellee to leave the office, that he was no longer welcome, and within an hour personally changed the locks to appellee's office, even though AMCI had a maintenance department to undertake such work. In addition, the evidence indicates that appellant was informed several times by appellee and by appellee's attorney through written letters that appellee needed to gain access to his business materials and equipment and that appellee was suffering damages in the amount of $640–$660 a day. Despite the requests, appellant refused to allow appellee to return to his office and told him his lawsuit was futile and that he knew all the "tricks." In addition, appellant had appellee's phone line disconnected.

None of appellant's actions provided any economic benefit to AMCI. Although appellant testified that his motive in locking appellee out of his office was for the purpose of collecting back rent, this self-help approach was not the proper procedure for collecting rent owed in any event, when the terms of the lease were still in effect at the time appellee was locked out. *Cf. K & K Management, Inc.*, 316 Md. at 178, 557 A.2d 965. Moreover, the jury could reject this testimony when weighing the other evidence and assessing the credibility of the witness. AMCI's accounts establish that appellee was in fact current in his rent. Furthermore, appellant never advised appellee that

his rent was overdue, and that AMCI planned to evict him. In addition, appellant admitted that he owed appellee at least $17,075. A jury could conclude that appellant's actions in locking appellee out of his office were reckless, wanton, oppressive, and done with intent to injure appellee. Therefore, the evidence was sufficient to submit the issue of punitive damages to the jury.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**