762 A.2d 991

ZACHAIR, LTD.

v.

John A. DRIGGS and The Driggs Corporation.

No. 2865, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Nov. 30, 2000.

404

406

Neil M. Gorsuch (Mark C. Hansen, Sarah O. Jorgensen and Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., on the brief), Washington, DC, for appellant.

Melvin J. Sykes, Baltimore (John C. Frederickson and Fossett & Brugger, Chartered, on the brief, Greenbelt), for appellees.

Argued before DAVIS, SONNER and PAUL E. ALPERT, (Ret., specially assigned), JJ.

ALPERT, Judge.

In this appeal, we are asked to resolve a long-standing dispute involving a 424–acre tract of land in Prince George's County known as Hyde Field, on which both an airport and a sand and gravel mining operation are located. In the course of this resolution, we address interesting problems concerning, *inter alia*, punitive damages and the conversion of mining products.

## PARTIES

The appellant and cross-appellee is Zachair, Ltd. ("Zachair"), the current owner of the property. Zachair was formed by Dr. Nabil Asterbadi for the purpose of acquiring Hyde Field at a foreclosure auction. The former owner, Washington Executive Airpark Limited Partnership ("the LP"), had purchased Hyde Field in 1988. To effectuate that purchase, the LP had given notes, totaling nearly $4,000,000.00 and apparently secured by deeds of trust, to Nationsbank[1] and to the previous owner of the property.

The appellees and cross-appellants are John Driggs ("Driggs") and The Driggs Corporation ("TDC"). Driggs owned and controlled Washington Executive Airport, Inc. ("WEA"), which was the sole general partner of the LP. Thus, Driggs controlled the LP that owned Hyde Field. The LP contracted with WEA to operate the airport, and WEA in turn subcontracted the job to Freedom Air, Inc.[2] The LP contracted with Southern Maryland Sand and Gravel Corporation ("Southern"), which was also owned and controlled by Driggs, to run the mining operation. In 1992, Southern was replaced as mining vendor by TDC, another corporation owned and controlled by Driggs.

---

1. The note was initially given to Nationsbank's predecessor, Maryland National Bank.

2. Driggs did not have an interest in Freedom Air, Inc.

## FACTS

Dr. Asterbadi was an amateur pilot who took flying lessons at Hyde Field. He eventually became interested in buying the property. Asterbadi initiated discussions with Driggs in 1991, but Driggs was not interested in selling.

Asterbadi subsequently learned from TDC's in-house counsel, James Berard, that both Driggs and the LP were in bankruptcy proceedings in the United States Bankruptcy Court for the District of Maryland and that the LP's notes to Nationsbank and the previous owner were in default. Unbeknown to Driggs, Asterbadi began negotiations later in 1991 to purchase the notes. In 1994, Asterbadi finally purchased the notes for $500,000.00. Asterbadi eventually foreclosed on the deeds of trust and an auction was held on November 3, 1994. Zachair was the high bidder at the auction, purchasing the property for $1,500,000.00.

Zachair presented evidence at trial that established that Driggs and the various entities he controlled threw a number of obstacles in the path of Zachair's acquisition of Hyde Field. In particular, Zachair presented evidence that, after Asterbadi purchased the notes from Nationsbank and the previous owner of Hyde Field, the LP filed a motion in connection with its bankruptcy proceedings to establish that the note  were invalid, then appealed from the denial of the motion. In this way, the LP delayed the foreclosure auction.

Zachair also presented evidence that Jeffrey Frost—who was then counsel for Driggs, counsel to TDC, a member TDC's board of directors, and a member of WEA's board of directors—attended the auction along with two of Driggs's friends, Charles Shapiro and Bruce Jaffe. The men disrupted the auction by raising numerous objections.

The evidence indicated that, after Zachair purchased the property at auction, Driggs, TDC, and the LP filed exceptions in the Circuit Court for Prince George's County to have the

sale set aside.[3]   WEA and TDC refused to vacate the property and continued to conduct airport and mining operations and to reap the profits therefrom, turning over only a little more than $3,000.00 in mining profits to Zachair.

Even after the exceptions to the sale were denied and the sale was ratified on February 3, 1995, WEA and TDC refused to vacate the property, and an eviction was scheduled for March 17, 1995.   On that date, TDC filed an emergency motion to stay the eviction on the ground that an appeal to this Court had been noted from the ratification of the sale. An appeal bond was never filed, however, and the eviction was rescheduled for, and carried out on, March 29, 1995.

The evidence indicated that Southern, which held a mining permit issued by the Bureau of Mines of the Maryland Department of the Environment, and which allowed TDC to use the permit to mine Hyde Field, refused to permit Zachair to use the permit and refused to consent to a transfer of the permit to Zachair.   In order to obtain the permit, Zachair had to file a declaratory judgment action in the Circuit Court for Baltimore City to establish that Southern's consent to the transfer was not necessary.[4]   The declaratory judgment action was not resolved until February of 1996, and Southern then appealed the decision to this Court.   The appeal was ultimately dismissed, and the permit was transferred to Zachair.

Upon the LP's application at the time it acquired Hyde Field, the Prince George's County Council, acting as the District Council, had granted a special exception to its zoning ordinance, allowing surface mining at Hyde Field.[5]   After the eviction, the LP, through Jeffrey Frost, sought to withdraw the application and to thus abolish the special exception.   A Zoning Hearing Examiner for the District Council denied the

---

**3.**  *See generally* Md. Rules 14–207(d) and 14–305(d).

**4.**  *See generally* Md.Code (1982, 1996 Repl.Vol., 2000 Cum.Supp.), §§ 15–301–15–312 of the Envir. art. (regarding permit procedures).

**5.**  *See generally* Prince George's County Code (1999 ed.), §§ 27–314 of Zoning Ordinance.

LP's attempt, and the LP appealed—unsuccessfully—to the District Council.

In October of 1997, Zachair filed suit against: Driggs; TDC; Southern; WEA; and Charles Shapiro and Bruce Jaffe, the two men who, with Frost, attended the foreclosure auction. The LP was not named in the suit, apparently because it was bankrupt when the suit was filed. The suit sought compensatory and punitive damages in connection with the various acts that impeded and delayed Zachair's acquisition and operation of Hyde Field. It contained counts against various combinations of the defendants for trespass, conversion, tortious interference with contractual or economic relations, breach of contract, unjust enrichment, fraud, malicious use of process, abuse of process, and conspiracy.

A jury trial was held in the Circuit Court for Prince George's County (Platt, J. presiding) in October of 1999. Before the case went to the jury, Zachair voluntarily dismissed the counts for trespass, breach of contract, unjust enrichment, and fraud. Further, Zachair voluntarily dismissed WEA and Southern from the case because the testimony established that they were "basically defunct." The case against Shapiro was stayed due to Shapiro's bankruptcy.

The remaining counts against Driggs, TDC, and Jaffe then went to the jury. The jury found that Driggs and TDC had: converted the property of Zachair and were thus jointly and severally liable for $1,975,000.00 in compensatory damages; tortiously interfered with the contractual or business relations of Zachair and were thus jointly and severally liable for $275,000.00 in compensatory damages; maliciously used process against Zachair and were thus jointly and severally liable for $2,596,550.00 in compensatory damages, including $346,000.00 in attorney fees; and abused process against Zachair and were thus jointly and severally liable for $2,596,550.00 in compensatory damages, including $346,000.00 in attorney fees. The court merged the awards for malicious use of process and abuse of process, without objection from Zachair, making the total award of compensatory damages

$4,846,550.00. The jury further found that the acts of Driggs and TDC, as to each of these counts, was "accompanied by evil motive, intent to injure or ill will." The jury found in favor of Jaffe as to all counts, however, and determined that neither Driggs nor TDC had conspired against Zachair.

In light of the findings that Driggs and TDC had acted with "evil motive, intent to injure or ill will," the case was returned to the jury for a determination as to punitive damages. After further deliberations, the jury imposed punitive damages against TDC of: $1,500,000.00 for conversion; $1,000,000.00 for tortious interference with contractual or business relations; $1,500,000.00 for malicious use of process; and $1,000,000.00 for abuse of process. Thus, it imposed a $5,000,000 award of punitive damages against TDC. The jury imposed a punitive damage award of $170,000.00 against Driggs, consisting of: $40,000.00 for conversion; $50,000.00 for tortious interference with contractual or business relations; $50,000.00 for malicious use of process; and $30,000.00 for abuse of process.

Driggs and TDC moved for judgment notwithstanding the verdict and, alternatively, for a new trial, to revise the verdict, or for a remittitur. The court granted in part the motion for a remittitur. Subject to Zachair's election to accept the remittitur or demand a new trial, the court reduced the combined award of compensatory damages for malicious use of process and abuse of process to $346,000.00, the amount representing attorney fees. The court explained:

Less attorney's fees, the damages awarded for the Abuse of Process and Malicious Use of Process claims total $2,250.550. Of this amount, Defendants contend that $550 represents eviction costs that were not recoverable under these counts. I agree and for that reason the compensatory award of the merged count will be remitted by $550 in addition to the further remittitur that follows.

Defendants assert the remaining damages, $2,250,000 represents an improper double recovery, based on the fact that its amount is equal to the sum of the amounts awarded for the Tortious Conversion and Tortious Interference with

Contractual Relations counts. On this point, I agree with Defendants.

. . .

I find that, plainly, damages were duplicated here. The remaining $2,250,000 award for the Abuse of Process and Malicious Use of Process claims can only represent compensation for damages resulting from the retained airport and mining revenues, and the interference with [a contract entered by Zachair with a mining vendor]. I need not engage in improper speculation in order to determine that these damages were already awarded in full in the counts for Conversion and Interference with Contractual Relations. Consequently, I conclude that the compensatory damages award in this case is excessive and should be reduced by $2,250,[550].

The court further reduced the awards of punitive damages from $5,000,000.00 against TDC to $650,000.00, and from $170,000.00 against Driggs to $125,000.00.[6] The court explained that, in doing so, it was "guided by the considerations applied by the Court of Appeals in *Bowden v. Caldor* [7] . . . ." The court recognized that the ratio of punitive damages to compensatory damages was "approximately a modest 1:1," but determined that the punitive damages awards were "simply disproportionate to the gravity of Defendant's wrongful conduct." It observed that "[t]he conduct was obviously not life threatening nor the type of conduct that would lead to permanent or even temporary physical injuries," and that

the economic injuries, while substantial, [were] certainly no greater and not in need of greater deterrence and/or punishment, than that which the Maryland General Assembly contemplated when it prescribed $500,000.00 as the maxi-

---

**6.** The court did not offer Zachair the option of a new trial rather than remittitur of the punitive damages award, and neither party suggests that it was required to do so. *See generally Bowden v. Caldor*, 350 Md. 4, 47, 710 A.2d 267 (1998).

**7.** *Id.*

mum fine for a so-called "commercial crime" under the Maryland antitrust statute, and $1,000,000.00 as the maximum fine for a single criminal offense under the drug kingpin statute.

The trial court considered "the tax returns and other financial documents admitted into evidence of both John A. Driggs and The Driggs Corporation" and concluded that "the respective awards against each are excessive in relation to the Defendant's ability to pay." It added that the award against TDC was several times higher than the largest criminal fine or civil penalty prescribed by the Legislature for any offense or misconduct. The court surmised that the award "appears excessive" in comparison to other punitive damages awards in Maryland, and that the separate awards of punitive damages for malicious use of process and abuse of process were duplicative.

Zachair noted an appeal from the trial court's ruling, and Driggs and TDC noted a cross-appeal.

### ISSUES

In its appeal, Zachair argues, in essence, that

I. The trial court erred in reducing the award of punitive damages.

In their cross-appeal, Driggs and TDC argue, in essence, that:

II. The trial court erred by failing to grant their motion for judgment notwithstanding the verdict as to conversion, in that (i) the evidence as to the mining damages amounted to nothing more than speculation and conjecture, and (ii) there was no evidence that TDC converted airpark revenues.

III. The trial court erred by submitting the issue of attorney fees to the jury with the counts for malicious use of process and abuse of process, then by failing to grant their motion for judgment notwithstanding the verdict as to any award of attorney fees.

IV. The trial court erred by failing to grant judgment notwithstanding the verdict in favor of TDC as to the tortious interference count, in that (i) there was no evidence that, once evicted from Hyde Field, TDC interfered with Zachair's relationship with its new mining contractor, and (ii) the evidence did not support the amount of the award.

Driggs and TDC add that, if this Court finds in their favor as to any of their arguments, compensatory damages would necessarily be "drastically reduced." They argue that, if that is the case, "[t]he only way to assure a well-grounded decision on punitive damages is to reverse the judgment and order a new trial on punitive damages."

We find no merit in any of the arguments presented in the appeal or cross-appeal.[8] We therefore affirm the judgment of the trial court. Because we do not find that any of the awards of compensatory damages must be reversed, we need not address the argument of Driggs and TDC as to punitive damages.

## DISCUSSION

### I

### Reduction of Punitive Damages Awards

Zachair points out that the ratio of punitive damages to compensatory damages, as awarded by the jury, was approximately one to one. It posits that the award of punitive damages was within "modest and well-established bounds," and that the trial court therefore was not justified in making the "drastic eighty-percent reduction. . . ." Zachair argues that "not one of [the trial court's] proffered reasons for substituting its judgment for the jury's can survive even the most glancing examination."

---

**8.** The record extract includes neither the full transcript of the motion for judgment, the transcript of the post trial motions, nor any memoranda in support of the motion for judgment or the post trial motions. We shall assume without deciding that the arguments presented by Driggs and TDC are properly before this Court. *See generally* Md. Rules 2–519 and 8–131(a).

In *Bowden v. Caldor, Inc.*, 350 Md. 4, 25, 710 A.2d 267 (1998), the Court of Appeals made clear that, "in a tort case where punitive damages are allowable, the amount of punitive damages awarded by the trier of fact is reviewable by the court for excessiveness." The Court summarized nine principles of Maryland common law that are applicable to judicial review of punitive damages awards for excessiveness: (1) " '[T]he amount of punitive damages must not be disproportionate to the gravity of the defendant's wrong.' " *Id.* at 27, 710 A.2d 267 (citation omitted); (2) " '[T]he amount of punitive damages should not be disproportionate to . . . the defendant's ability to p . .' " *Id.* at 28, 710 A.2d 267 (citation omitted); (3) "The deterrence value of the amount awarded by the jury, under all the circumstances of the case, is relevant." *Id.* at 29, 710 A.2d 267; (4) " '[S]ubstantial deference' " should be accorded " 'to legislative judgments concerning appropriate sanctions for the conduct at issue,' " and "when a punitive damages award is several times higher than the largest criminal fine or civil penalty prescribed by the Legislature for *any* offense or misconduct, the award should be strictly scrutinized." *Id.* at 31, 710 A.2d 267 (emphasis in original) (citation omitted); (5) Awards should be compared "with other final punitive damages awards in the jurisdiction and particularly with awards in somewhat comparable cases." *Id.* at 31, 710 A.2d 267; (6) "[E]vidence of other final and satisfied punitive damages awards against the same defendant for the same conduct may be considered by the trial judge," as well as "evidence indicating that there have been no other such awards of punitive damages against the defendant for the same conduct. . . ." *Id.* at 34, 710 A.2d 267; (7) "When the total amount of punitive damages awarded against the defendant is based on separate torts, a pertinent consideration . . . is whether the separate torts all grew out of a single occurrence or episode." *Id.* at 34, 710 A.2d 267; (8) "The plaintiff's reasonable costs and expenses resulting from the defendant's malicious and tortious conduct, including the expenses of the litigation, which are not covered by the award of compensatory damages, are matters which appropriately can be consid-

ered...." *Id.* at 36, 710 A.2d 267; and (9) "Whether a punitive damages award bears a reasonable relationship to the compensatory damages awarded in the case is ... a factor to be considered...." *Id.* at 39, 710 A.2d 267.

The list set forth in *Bowden* was not "intended to be exclusive or all encompassing," and "not all of the ... factors are pertinent in every case involving court review of punitive damages awards." *Id.* at 41, 710 A.2d 267. *See also Merritt v. Craig,* 130 Md.App. 350, 371, 746 A.2d 923 (where this Court relied upon only four of the principles set forth in *Bowden* in holding that a trial court properly determined that a punitive damages award of $150,000.00 against a seller of real property was not excessive in a fraud case where the seller willfully misrepresented the condition of a water supply system and the buyer was entitled to nearly $50,000.00 in compensatory damages or rescission of the contract of sale), *cert. denied,* 359 Md. 29, 753 A.2d 2 (2000). *See generally Alexander & Alexander, Inc. v. B. Dixon Evander & Associates, Inc.,* 88 Md.App. 672, 715–16, 596 A.2d 687 (where, prior to the *Bowden* decision, this Court set forth a list of factors, similar to the list in *Bowden,* to consider in determining whether an award of punitive damages is excessive), *cert. denied,* 323 Md. 1, 590 A.2d 158 (1991), 323 Md. 2 (1991), and 326 Md. 435, 605 A.2d 137 (1992).

The *Bowden* Court explained that the principles for reviewing an award of punitive damages are legal principles, and that

> in applying legal principles to reduce a jury's punitive damages award, [a court] is performing a legal function and not acting as a second trier of fact. Although the function also involves the evidence in the case, it is similar to the legal function of granting a judgment notwithstanding a verdict.

*Bowden,* 350 Md. at 47, 710 A.2d 267. Thus, in reviewing the trial court's decision, this Court is reviewing a decision of law rather than a finding of fact, and we need not extend deference to the decision of the trial court. "Because the issue ...

on which the court ruled was a purely legal issue, ... our review is expansive." *In re Michael G.*, 107 Md.App. 257, 265, 667 A.2d 956 (1995).

■ Our application of the relevant factors set forth in *Bowden* to the instant case convinces us that the reduction of punitive damages was proper.

### —*Gravity of Wrong*—

In reducing the punitive damages awards in the instant case, the trial court expressly recognized that, under *Bowden*, "[t]he most important legal rule in this area, applicable to every punitive damages award, is that the amount of punitive damages 'must not be disproportionate to the gravity of the defendant's wrong.'" *Bowden*, 350 Md. at 27, 710 A.2d 267 (citation omitted). The court then opined that, "while [the conduct of Driggs and TDC was] clearly wrong and deserving of sanction in the form of punitive damages, the gravity of the wrong does not, if placed on a continuum of wrongful conduct which has in this state justified the award of punitive damages, reach the level necessary to justify an award of the size given here by the jury."

The court assigned great weight to the undisputed fact that the conduct was not life threatening nor of the type to lead to physical injury. As the Court of Appeals indicated in *Bowden*, 350 Md. at 42, 710 A.2d 267, and this Court indicated in *Alexander & Alexander, Inc.*, 88 Md.App. at 721, 596 A.2d 687, the assignment of such weight was entirely proper. In *Bowden*, a jury awarded $9,000,000.00 in punitive damages against retail store Caldor and in favor of a teenage employee who was wrongfully accused of theft and fired by Caldor. The trial court reduced the award as excessive, and the Court of Appeals agreed. The Court observed that the award was "about thirteen times higher than the largest punitive damages award ever upheld by this Court," and was "one hundred and fifty times higher than the compensatory damages award-ed in this case." 350 Md. at 42, 710 A.2d 267. The Court concluded, *inter alia*, that the size of the award was not

justified by the gravity of the wrong. It explained: "As heinous as it was, . . . Caldor's malicious and wrongful conduct was not life threatening or the type of conduct which would likely lead to permanent physical injuries." *Id.* at 42, 710 A.2d 267.

In *Alexander & Alexander, Inc.*, 88 Md.App. 672, 596 A.2d 687, a jury awarded more than $40,000,000.00 in punitive damages against one insurance broker and in favor of another insurance broker where the first broker interfered with the second broker's contract with a client and thus deprived the second broker of commissions. The award "represent[ed] nearly fifty times the . . . compensatory damages." *Id.* at 720, 596 A.2d 687. The trial court reduced the award to $12,500,-000.00, but this Court vacated the award and remanded the case for a new trial as to punitive damages. We explained that in those cases in which high awards of punitive damages have been allowed to stand, the harm has involved death or, at least, substantial health or environmental damage. We stated:

> Nothing like that kind of harm occurred in this case. A & A did not endanger the public health or safety; its conduct was not life-threatening to anyone. We accept the conclusions reached below that it set out to cause economic harm to a competitor, that it used inappropriate means to achieve that goal, and that it should be punished for, and others should be deterred from, engaging in that conduct. But nothing approaching $12.5 million is necessary to achieve either goal.

*Id.* at 721, 596 A.2d 687.

The trial court also evaluated the gravity of the conduct by comparing it to certain conduct for which the Legislature has enacted specific penalties. It pointed to (i) § 11–212 of the Commercial Law article, which establishes a penalty of "a fine not exceeding $500,000 or imprisonment not exceeding six months or both" for "[a]ny person who willfully violates" certain antitrust provisions, and (ii) § 286(g) of article 27, which provides for "[a] fine of not more than $1,000,000," in

addition to "[i]mprisonment for not less than 20 years nor more than 40 years," for drug kingpins who commit certain drug offenses. The court recognized that the acts proscribed by the Legislature are not the same as the acts committed by Driggs and TDC. It suggested that the proscribed antitrust and drug kingpin violations are more heinous than any act committed by the appellants, yet the financial aspects of the penalties for those violations are less severe than the penalty imposed upon the appellants by the jury.

*—Ability to Pay—*

The trial court explained that, "[h]aving independently considered the tax returns and other financial documents admitted into evidence of both John A. Driggs and The Driggs Corporation, [it] found that the respective awards against each are excessive in relation to Defendants' ability to pay." The trial court did not specify precisely what evidence indicated that Driggs or TDC would be unable to pay the jury's award.

Tax returns for the year 1997 which were entered into evidence established that, for that year, Driggs and his wife had a total income of $679,684.00. Those same tax returns indicated that, for 1997, the Driggses suffered nearly $100,000.00 in losses from various investments and paid $87,874.00 in home mortgage interest and points, $232,000.00 in mortgage interest to banks for rental real estate, taxes of more than $185,000.00, and nearly $45,000.00 in legal fees. Taking into account that the Driggses no doubt had other expenses, it is apparent that they would have found it extremely difficult to pay the $170,000.00 award of punitive damages.

TDC's tax returns for 1997 showed that, for 1997, TDC's total income was $10,257,679.00. TDC's taxable income—the amount left after payment of salaries and wages, debts, rents, taxes, and other expenses—was only $1,643,225.00. It is thus apparent that the $5,000,000.00 punitive damages award against TDC would work a substantial hardship against TDC.

■ In any event, assuming *arguendo* that both Driggs and TDC had the ability to pay the awards against them, over an extended period of time if not immediately, that alone would not justify the awards. As the Court of Appeals explained in *Bowden,*

> merely because a defendant may be able to pay a very large award of punitive damages, without jeopardizing the defendant's financial position, does not justify an award which is disproportionate to the heinousness of the defendant's conduct. . . .
>
> " '[W]here a defendant has not committed an act that would warrant a large punitive damages award, such an award should not be upheld upon judicial review merely because the defendant has the ability to pay it.' "

*Bowden,* 350 Md. at 28–29, 710 A.2d 267 (citation omitted).

### —Deterrence Value—

The trial court did not discuss the deterrence value of the amount awarded, except to observe that the conduct in question was "not in need of greater deterrence and/or punishment" than the conduct proscribed by Maryland's antitrust statute [9] or drug kingpin statute.[10] We agree that the conduct was not so heinous as to require, for deterrence, what would be one of the largest punitive damages awards ever made in this State.

### —Legislative Sanctions—

In *Bowden,* 350 Md. at 31, 710 A.2d 267, the Court of Appeals explained that, "when a punitive damages award is several times higher than the largest criminal fine or civil penalty prescribed by the Legislature for *any* offense or misconduct, the award should be strictly scrutinized." (Emphasis in original.) As the trial court indicated, the punitive damages, at least cumulatively, were several times higher than

---

9. Code (1975, 2000 Repl.Vol.), § 11–212 of the Comm. Law art.

10. Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), § 286(g) of art. 27.

any fine or penalty authorized by the Legislature, even if the conduct upon which the damages were based could be viewed not as a single action but as several different actions which could warrant several different fines or penalties.

*—Comparison to Other Awards—*

■ Particularly significant in determining whether an award of punitive damages is excessive is a comparison of the award to "other final punitive damages awards in the jurisdiction." *Bowden,* 350 Md. at 31, 710 A.2d 267. The trial court conducted such a comparison and determined that, "[i]n light of other awards upheld by the Court of Appeals, the award against The Driggs Corporation appears excessive." In our view, that statement applies equally to the award against Driggs.

The *Bowden* Court conducted an exhaustive review of Maryland cases involving large awards of punitive damages. Zachair directs us to no Maryland cases involving larger awards that have been decided since *Bowden* was filed. The *Bowden* Court summarized:

In *Alexander & Alexander[,] Inc. v. B. Dixon Evander & Assoc., Inc.* 88 Md.App. 672, 720, 596 A.2d 687, 710–711 (1991), *cert. denied,* 326 Md. 435, 605 A.2d 137 (1992), Chief Judge Wilner for the Court of Special Appeals, in vacating an extremely large punitive damages award, stated:

"On this record we do not believe that a $12.5 million punitive award comports with [the law]. Although we cannot say with complete certainty that it is the largest punitive award rendered by a Maryland court, it is the largest, by far, of which we are aware. The nearest in amount was $7,500,000 rendered in *Potomac Electric v. Smith,* 79 Md.App. 591, 558 A.2d 768 . . . [, *cert. denied,* 317 Md. 393, 564 A.2d 407 (1989), *overruled on other grounds in United States v. Streidel,* 329 Md. 533, 620 A.2d 905 (1993) ], and the nearest to that was $1,000,000, which we vacated in *Edmonds v. Murphy,* . . . 83 Md. App. 133, 573 A.2d 853 [ (1990), *aff'd,* 325 Md. 342, 601 A.2d 102 (1992) ]. Most of the punitive awards to date have been well under $100,000; other than the award in

*Potomac Electric,* the highest allowed to stand was $910,000 against Exxon Corporation in *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986)[, *cert. denied,* 309 Md. 47, 522 A.2d 392 (1987) ].

[T]he $12.5 million allowed by the court [is] extraordinary in terms of Maryland history. . . .

The cases in which punitive damages awards have been upheld by this Court are even more striking. Apparently the largest award of punitive damages which has ever been upheld by this Court was $700,000, and in that case the size of the award was not an issue before this Court. *Franklin Square Hosp. v. Laubach,* 318 Md. 615, 617–618, 569 A.2d 693, 694–695 (1990). The next ten highest awards of punitive damages upheld by us seem to be as follows: $107,875 (*St. Luke Church v. Smith,* 318 Md. 337, 568 A.2d 35 (1990)); $100,000 each for two plaintiffs, based on two separate acts of fraud (*Nails v. S. & R.,* 334 Md. 398, 639 A.2d 660 (1994)); $82,000 (*Luppino v. Gray,* 336 Md. 194, 647 A.2d 429 (1994)); $50,000 (*Macklin v. Logan,* 334 Md. 287, 639 A.2d 112 (1994)); $40,000 (*Embrey v. Holly,* . . . 293 Md. 128, 442 A.2d 966 [ (1982) ] ); $36,000 (*Drug Fair of Md., Inc. v. Smith,* 263 Md. 341, 283 A.2d 392 (1971)); $35,000 (*General Motors Corp. v. Piskor,* 281 Md. 627, 381 A.2d 16 (1977)); $30,000 (*Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 261 A.2d 731 (1970)); $25,000 (*Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 340 A.2d 705 (1975)); $25,000 (*American Stores Co. v. Byrd,* 229 Md. 5, 181 A.2d 333 (1962)). Moreover, in most of these cases no argument was made that the punitive awards were excessive.

We recognize that the awards involved in the older cases cited above, if adjusted for inflation, would be larger in terms of present dollars. Nonetheless, a multi-million dollar award of punitive damages is entirely beyond the range of punitive damages awards previously upheld by this Court."

*Bowden,* 350 Md. at 32–33, 710 A.2d 267.

It is thus apparent that the $5,000,000.00 award against TDC is far above the range of punitive damages awards

accepted in Maryland, and the $170,000,00 award against Driggs as an individual is somewhat above that range.

## —Duplication of Awards—

■ If separate punitive damages are awarded for separate torts, but "the separate torts all grew out of a single occurrence or episode," the awards may be duplicative. *Bowden,* 350 Md. at 34, 710 A.2d 267. The trial court determined that the malicious use of process and abuse of process claims "[b]oth ... arise out of Defendants' misuse of the court system, and thus may be said to have their basis in one continuous course of conduct." By this, the court indicated that one reason it was reducing the punitive damages awards was because it believed them to be, in part, duplicative.

Zachair now suggests that the "malicious use of process claim involved the filing of multiple frivolous legal proceedings from 1994 through 1997," while the "abuse of process claim involved defendants' efforts to use process ... as part of an ulterior scheme to force Zachair off [Hyde Field] and to resume lucrative mining operations." At the trial below, however, Zachair expressly agreed that the awards of compensatory damages for malicious use of process and abuse of process were duplicative and should be merged. Zachair may not be heard to argue otherwise on appeal.

## —Relationship to Compensatory Damages—

Zachair makes much of the fact that the ratio between the jury's awards of punitive damages and compensatory damages is approximately one to one. Zachair contends that "[a]wards with a ratio of 3:1 between punitive damages and compensatory damages are presumptively proper as a matter of law."

In *Bowden,* the Court of Appeals explained that an award of punitive damages should bear "a reasonable relationship to the compensatory damages awarded." *Bowden,* 350 Md. at 39, 710 A.2d 267. The court noted that when the ratio of punitive damages to compensatory damages is greater than three to one, it is likely—but by no means certain-that the relationship is not reasonable. *See id.* at 39 n. 11, 710 A.2d 267. The

court observed that, "in some states where the matter is controlled by statutes, there are statutory provisions that the amount of a punitive damages award, where authorized, may not exceed three times the amount of the plaintiff's actual or compensatory damages." *Id.* It added: "This three to one ratio corresponds to numerous statutes in Maryland and throughout the country . . . authorizing treble damages as a civil penalty." Id. at 40 n. 11, 710 A.2d 267.

■ Contrary to Zachair's suggestion, the *Bowden* Court did not suggest that punitive damages should not be deemed excessive unless the ratio between them and any compensatory damages awarded exceeds three to one. The Court specifically stated: "[W]e do not suggest that punitive damages awards in most cases must reflect this ratio." *Id.* The Court acknowledged, moreover, that "there are situations in which little or no consideration should be given to the relationship which punitive damages awards bear to compensatory damages awards." *Id.* at 40, 710 A.2d 267. We are satisfied that the situation at hand-where a multi-million dollar award of compensatory damages was made for purely economic loss-is just such a situation.

*—Propriety of Reduction—*

The trial court's reduction of the punitive damages awards changed the ratio of punitive damages to compensatory damages from approximately one to one to approximately one to five. Both the award against TDC and the award against Driggs remain among the highest punitive damages awards ever made in this State, however. While certainly egregious, the conduct in question did not pose a risk to life or health and, as the trial court explained, was no more heinous than other acts for which the Legislature has prescribed lesser penalties. Driggs and TDC were engaged in a battle to save their businesses. Under the circumstances, we are convinced that the trial court properly reduced the awards of punitive damages.

## II

### Conversion

In the cross-appeal, Driggs and TDC first take issue with the jury's award of $1,975,000.00 [11] in compensatory damages for converting mining products and airport revenues from November 3, 1994, when Zachair purchased Hyde Field at auction, until March 29, 1995, when the eviction occurred.

### —*Conversion of Mining Products*—

■ As to the mining products, Driggs and TDC contend that Zachair failed to present sufficient evidence as to the precise amount and type of materials removed from the property, as well as the value of the materials. They assert that the only credible evidence was the testimony of Driggs himself, to the effect that about 15,000 tons of bank run gravel was removed from the property during the relevant period and was sold for $2.00 to $2.25 per ton. Driggs and TDC argue that, even if Zachair could have received $2.50 per ton— a figure Driggs and TDC purportedly base on numbers supplied by TDC counsel James Berard to Dr. Asterbadi when Asterbadi first inquired about purchasing Hyde Field from the LP—it was only entitled to $41,755.07, which represented $45,000 in compensatory damages for the mining products, less $3,276.03 that TDC already paid Zachair. Driggs and TDC thus argue that the trial court should have either reduced the compensatory damages awarded for conversion to $41,755.07 or granted a new trial.

■ "In an action for conversion of . . . property, a plaintiff is entitled to 'the fair market value of the property at the time of conversion, with legal interest thereon to the date of the verdict.'" *Postelle v. McWhite*, 115 Md.App. 721, 728, 694 A.2d 529 (1997) (citation omitted). Indeed, under Code (1974, 1998 Repl.Vol.), § 11–202(b) of the Cts. & Jud. Proc. art., when the conversion involves mining products and "the miner-

---

11. The parties tacitly concede that this figure represents $1,875,000.00 in mining revenues and $100,000.00 in airpark revenues.

als were abstracted furtively or in bad faith[,] the measure of damages is the value of the minerals ready for market without allowance for labor and expenses." There is no dispute that the jury in the case *sub judice* determined that Driggs and TDC acted in bad faith.

As a general rule,

the evidence to warrant damages must show that the plaintiff has sustained some injury and must establish sufficient data from which the court or jury can properly estimate the extent of the damages. Damages must be proven with reasonable certainty, or some degree of specificity, and may not be based on mere speculation or conjecture.

8 Maryland Law Encyclopedia, *Damages* § 193 at 159 (1985) (footnotes omitted). As to the degree of certainty required, the Court of Appeals has explained:

Courts have modified the "certainty" rule into a more flexible one of "reasonable certainty." In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.

Some of the modifications which have been aimed at avoiding the harsh requirements of the "certainty" rule include: (a) if the fact of damage is proven with certainty, the extent or the amount of therefor may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the amount of damage is not required; (e) it is sufficient if the best evidence of the damage which is available is produced. . . .

*M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 348–49, 138 A.2d 350 (1958) (regarding damages for lost profits in breach of contract case). *See also David Sloane, Inc. v. Stanley G. House & Associates, Inc.,* 311 Md. 36, 40–41, 532 A.2d 694 (1987); *Impala Platinum Ltd. v. Impala Sales, Inc.,* 283 Md. 296, 330–31, 389 A.2d 887 (1978); *Stuart Kitch-*

*ens, Inc. v. Stevens,* 248 Md. 71, 74–75, 234 A.2d 749 (1967); *Della Ratta, Inc. v. American Better Community Developers, Inc.,* 38 Md.App. 119, 139, 380 A.2d 627 (1977) (all reiterating same in context of lost profits from breach of contract). *See generally* Charles T. McCormick, *Damages* §§ 26 and 27 (1935) (discussing the certainty rule as to damages and the modifications thereto); 25A C.J.S., *Damages* § 162(2) at 80–81 (1966) ("Proof of the amount of loss with absolute or mathematical certainty is not required").

Preliminarily, it is significant that Zachair presented evidence, by way of the deposition testimony of TDC corporate representative Reginald Burner, that a daily report of the mining activities at Hyde Field was normally prepared. A daily report contained figures specifying the types and amounts of materials mined that day. Asterbadi testified, however, that he asked Driggs and TDC several times for the records of the mining activity for the five month period in question but was told there were no records. The jury apparently accepted Asterbadi's testimony. In denying the post trial motions of Driggs and TDC as to the compensatory damages for conversion, the trial court commented:

> ... I am very much aware that the difficulty that Plaintiff experienced in obtaining and producing evidence to show these quantities of mining materials and revenue was in large part caused by the absence of records available from Defendants, and Plaintiff's lack of access to the property. Neither of these sources of plaintiff's difficulty in producing proof were not [sic] caused by Zachair, Ltd., and in fact, form part of Plaintiff's Complaint in this case.

Zachair posited that, during the five month period in question, Driggs and TDC mined at least 300,000 tons of materials from Hyde Field.[12] In order to establish that amount, Zachair offered into evidence a document entitled "Business Plan or Airport Sand and Gravel, Inc.," which was provided to Aster-

12. Driggs and TDC point out in their brief that in March of 1995, toward the end of the five month period in question, Zachair filed a motion to enjoin the mining operations on Hyde Field. In a memorandum in support of the motion, Zachair asserted that TDC had ceased

badi by TDC attorney James Berard when Asterbadi first inquired about purchasing Hyde Field. The document stated: "It is projected that annual sales of material from the property will be between 600,000 and 720,000 tons." As Zachair calculates in its brief, these figures break down to "250,000 to 300,00 tons over a five-month period." We recognize that, when he supplied the document, Berard told Asterbadi that he "needed to run this past a guy who knows a little bit about the business" and cautioned him not to "place too much reliance on this draft." In deposition testimony read into evidence at trial, however, Berard confirmed that prior to the events at issue about 50,000 tons of materials per month were mined from Hyde Field. Similarly, TDC corporate representative Burner testified during his deposition that the "historical average" of the mining operation was 45,000 to 50,000 tons of materials per month.

Asterbadi testified that, during the five month period in question, he visited Hyde Field three to four times per week and stayed for two to three hours at a time. Asterbadi "could see the trucks going in and out like crazy," and estimated that during each two to three hour period he was there he saw 200 to 300 trucks leave. Asterbadi could not tell what the trucks were carrying, but he observed that at least half of them bypassed the weight scale on their way out. It appeared to Asterbadi that mining operations "were going full blast." The operations did not abate during the entire five month period.

mining operations upon the sale to Zachair but had recently resumed them. The motion was supported by the affidavits of two Freedom Air employees who stated, in essence, that mining operations had ceased in early November of 1994 but had resumed in late February of 1995. Zachair attorney Nelson Deckelbaum testified at trial that he was laboring under a misunderstanding when he prepared the motion and that he learned one day after filing it that TDC had been mining the property all along. There is little explanation in the record as to why the two Freedom Air employees stated in their affidavits that mining and ceased for a period of time. In any event, the jury discounted the affidavits, and "[i]t is axiomatic that the weight of the evidence and the credibility of witnesses are always matters for the jury to determine when it is the trier of facts." *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991).

In March of 1995, Asterbadi hired Michael Levein, a private investigator, to watch the property. Levein testified that he watched the property for two full work days and each day saw 50 to 60 trucks per hour leave. Many of the trucks avoided the weight scale. Levein followed several trucks to the Prince George's County Landfill and followed several others to a construction site. He could not tell precisely what materials the trucks contained.

Zachair also called Peter Woo, a civilian technician with the Washington D.C. Metropolitan Police Department's police helicopter unit. Woo testified that he worked at Hyde Field for eight hours a day, five days a week, during the period in question, and that he saw continuous mining activity there. Woo added that, on February 27, 1995, the airport manager asked him to make a videotape of the mining activity. Woo believed the mining activity that day was "[n]ormal" for the period in question, and that about 40 trucks per hour left the facility. Like the other witnesses, Woo could not tell exactly what was in the trucks.

Finally, Zachair relied on the deposition testimony of James Berard, that each truckload consisted of 19 to 20 tons of materials.

In light of this testimony, Zachair's contention that 300,000 tons of materials were taken during the five month period was more than reasonable. Using Peter Woo's testimony, which contained the lowest estimate of trucks per hour leaving Hyde Field, the evidence amply established that well over the amount claimed by Zachair was taken. With 40 trucks leaving the facility each hour, and with each truck containing at least 19 tons of materials, the evidence suggested that 760 tons of material were taken each hour. Given Woo's testimony that such mining activity occurred at least during the 40 hours per week that he spent at Hyde Field, the evidence indicated that 30,400 tons of materials were removed per week, and at least 121,600 per month. The total for the five month period would be 608,000 tons of materials—far more than the 300,000 claimed by Zachair.

Zachair further urged the jury to award compensatory damages of $6.25 for each of the 300,000 tons of converted materials. To establish the reasonableness of that figure, Zachair relied on testimony as to the market rates for the various types of materials mined from Hyde Field: sand and gravel, which is produced from bank run gravel; bank run gravel; top soil; and overburden, or clay. Zachair presented the deposition testimony of James Berard, by which Berard testified that the market price for sand and gravel was $6.25 per ton undelivered, although the price might be lower for a high-volume customer. Berard further testified that the market price for top soil was between $8.00 and $10.00 per ton undelivered. John Driggs, who testified for the defense, stated that TDC had a contract with the Prince George's County landfill, by which it delivered to the landfill the various types of mining products. The prices paid by the landfill ranged from $4.80 per ton, for overburden, to $12.80 per ton for "subbase material."

██ Keeping in mind that Zachair presented evidence that, despite repeated requests to do so, neither Driggs nor TDC ever turned over any mining records that would have specified the types of materials that were taken, and that "where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty," *M & R Contractors & Builders, Inc.*, 215 Md. at 349, 138 A.2d 350, Zachair would have been well within its rights to have asked that the jury conclude that all of the materials taken were of the most expensive type. Instead, it asked that the 300,000 tons of materials taken be valued at the lower end of the price scale, at $6.25 per ton, for total damages of $1,875,000.00. Again, under the circumstances Zachair's request and the jury's award were more than reasonable.

*—TDC's Role in Conversion of Airpark Revenues—*

██ TDC points out that it was the mining vendor at Hyde Field during the relevant period. It argues that the evidence failed to connect it to the conversion of the airpark revenues. TDC argues that the trial court erred by failing to

"eliminate $100,000 from any damages assessed against TDC" pursuant to the motion for judgment notwithstanding the verdict, or to grant TDC a new trial.

TDC's argument ignores that "Maryland has expressly recognized aider and abettor tort liability." *Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 199, 665 A.2d 1038 (1995) (involving allegations of aiding and abetting in commission of fraud). " 'A person may be held liable as a principal . . . if he, by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort.' " *Id.* (citation omitted). Provided there is a " 'direct perpetrator of the tort,' " an aider and abettor may be held liable for commission of the tort. *Id.* (citation omitted).

While TDC was indeed unconnected with the operations of the airpark, Zachair presented evidence that Jeffrey Frost was counsel for Driggs, counsel for TDC, a member of the Board of Directors of TDC, and a member of the Board of Directors of WEA, which was hired by the LP to operate the airpark and which subcontracted the job to Freedom Air, Inc. Zachair presented evidence that, after it purchased Hyde Field at auction, the owner of Freedom Air, Michael Gartland, made inquiries as to whether Freedom Air should begin paying revenues to Zachair rather than WEA. Frost wrote a letter to Gartland on TDC stationery. In the letter, Frost warned Gartland to "abide by your contractual obligations [with WEA] and 'butt-out' of affairs that do not concern you." In addition, Frost testified at trial that TDC "was paying for services of outside counsel to fight in adversary proceedings against Zachair," including the exceptions to the sale which delayed the eviction of WEA and Freedom Air from the airpark. Clearly, Zachair presented ample evidence that TDC aided and abetted the conversion of the airpark revenues.

## III

### Attorney Fees

Upon finding that Driggs and TDC had abused process and maliciously used process, the jury awarded Zachair

$2,596,00.00 in compensatory damages as to each of those counts, specifying on the verdict sheet that $346,000 of each award was to compensate Zachair for its attorney fees. As we have explained, the court later merged the two awards and reduced the total amount to $346,000.00, the amount of attorney fees.

Driggs and TDC argue that the trial court erred by submitting the issue of attorney fees to the jury with the abuse of process and malicious use of process counts, and later by failing to grant their motion for judgment notwithstanding the verdict as to that portion of the award representing attorney fees. Driggs and TDC do not contend that Zachair was not entitled to some amount of attorney fees in light of the abuse of process and malicious use of process. *See generally Watson v. Watson,* 73 Md.App. 483, 497, 534 A.2d 1365 (1988) (holding that, under Md. Rule 1–341, "a Maryland judge has . . . authority to impose litigation expenses, including those of attorney fees, against counsel who willfully abuse judicial process"); W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 120 at 895 (5th ed.1984) (explaining that, where a civil suit has been brought through misuse of legal procedure, "[c]ounsel fees incurred in defending against the wrongful civil suit are prominent among items of recovery . . ."). *Cf. Bresnahan v. Bresnahan,* 115 Md.App. 226, 244, 693 A.2d 1 (commenting that "a plaintiff in a malicious prosecution action, who has incurred counsel fees in the defense of the criminal charge, may be awarded those fees as damages in the civil action"), *cert. denied,* 346 Md. 629, 697 A.2d 913 (1997). Nor do they contend that it was for the court rather than the jury to determine the proper amount of attorney fees. *See generally Admiral Mortgage, Inc. v. Cooper,* 357 Md. 533, 545–553, 745 A.2d 1026 (2000) (discussing whether attorney fees are to be determined and awarded by the judge or the jury). Driggs and TDC argue, instead, that Zachair failed to present sufficient evidence that the attorney fees it paid were reasonable.

▇ As in the case of any award of compensatory damages, attorney fees must be proven with reasonable certainty. As a general rule:

"(a) the party seeking the fees, whether for him/herself or on behalf of a client, always bears the burden of presenting evidence sufficient for a trial court to render a judgment as to their reasonableness; (b) an appropriate fee is always reasonable charges for the services rendered; (c) a fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client; (d) a request for fees must specify the services performed, by whom they were performed, and the hourly rates charged; (e) it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; (f) without such records, the reasonableness, vel non, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence."

*Rauch v. McCall,* 134 Md.App. 624, 639, 761 A.2d 76 (2000) (discussing proof necessary for award of attorney fees where award is authorized by contract) (citation omitted). *See also Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership,* 100 Md.App. 441, 453, 641 A.2d 977 (same).

The general rule is not inflexible, however. In *Milton Co. v. Council of Unit Owners of Bentley Place Condominium,* 121 Md.App. 100, 121, 708 A.2d 1047 (1998), *aff'd,* 354 Md. 264, 729 A.2d 981 (1999), the appellant challenged an award of attorney fees, made by the judge, on the ground that the appellee "never presented any contemporaneous time records to establish how much time its attorneys spent working on the case." This Court affirmed the trial court's determination that such records were unnecessary "because the unrebutted testimony of appellee's expert witness provided a sufficient basis for the award of fees." *Id.* We explained:

"[A] trial court enjoys a large measure of discretion in fixing the reasonable value of legal services. That amount will not be disturbed unless it is clearly an abuse of discretion." ...

"While time is one of the applicable factors, the record need not contain evidence specifically delineating the num-

ber of hours spent by counsel. Because the record itself
discloses the nature of the proceedings, it is some evidence
of the extent of the attorney's efforts . . . ."

*Id.* (citations omitted).

The award of attorneys fees was based on the services of
two attorneys, Nelson Deckelbaum and Richard Reed, and
other members of their law firms. Driggs and TDC point out
that Zachair did not offer into evidence bills of either attorney
and thus offered no documentary evidence as to the hours
each attorney worked, precisely what they did during those
hours, and precisely what they charged for each task per-
formed. Although Deckelbaum had before him as he testified
a summary of his bills, the summary was not offered into
evidence. Driggs and TDC argue that the course followed by
Zachair in offering the testimony of the two attorneys violated
Md. Rules 5–703, 5–704, 5–705, and, as to Deckelbaum's
summary, 5–1006.

Upon reviewing the evidence, we are satisfied that the trial
court properly exercised its discretion in permitting the issue
of attorney fees to go to the jury. Dr. Asterbadi testified at
length regarding the various litigations initiated by Driggs
and TDC, and about the various other legal obstacles Driggs
and TDC erected in his path. Asterbadi described: the
efforts to invalidate the notes from the LP to Nationsbank and
the original owner of Hyde Field; the difficulties presented at
the foreclosure auction; the exceptions filed from the sale at
the foreclosure auction; the first and second scheduled evic-
tions; the efforts to block the transfer of the mining permit;
and the efforts to have the special exception revoked. Aster-
badi explained that, at each juncture, his attorneys had to
respond to the actions of Driggs, TDC, and others, all at a
substantial cost to him.

Deckelbaum, too, testified regarding many of the actions he
and other members of his firm took on Asterbadi's behalf in
response to the actions of Driggs and TDC. Deckelbaum
described defending Zachair in connection with the litigation
over the notes. He explained that action regarding the notes
was filed in August of 1994 and was resolved in Zachair's favor

on motion for summary judgment in April of 1995. Deckelbaum described in detail his work in connection with the foreclosure auction, his efforts to have the airpark revenues turned over to Zachair instead of the LP, and his efforts to obtain an injunction to prevent TDC from continuing to mine Hyde Field. He further described the first scheduled eviction, the successful eviction, and his attempts to obtain the costs of the eviction from Driggs and TDC.

Deckelbaum was permitted to testify as an expert witness "as to what attorney's fees ought to be for these types of cases." [13] He explained that he was a member of the American College of Bankruptcy Attorneys, which "is a society of professionals who practice bankruptcy law for fifteen years or more, who are elected by their colleagues throughout the country to better advance bankruptcy law...." Deckelbaum testified that his firm billed Zachair by the hour, and that the hourly rates were "based upon [the] experience of the lawyer involved in a particular case." He added that the rates charged by lawyers at his firm "are equivalent to what other lawyers with similar experience and background charge." Finally, Deckelbaum testified that his firm billed Zachair a total of $131,036.40. He explained that, of that amount, $12,701.75 was for the litigation over the notes, $106,524.85 was for defending against the exceptions to the foreclosure sale, $8,240.35 was for defending against the attempt to withdraw the special exception, and $3,569.35 was for the transfer of the mining permit.

Attorney Richard Reed testified that he specialized in land use.[14] He was hired by Zachair to do further work in connec-

---

13. The court declined to permit Deckelbaum to testify as an expert witness for any other purpose, apparently because Zachair committed a discovery violation by failing to timely reveal that it intended to call Deckelbaum as an expert. The court explained: "He may give opinions ... if he has any legal bills, he may give opinions on that.... He may not give opinions on ultimate issues that he had nothing to do with...."

14. It is not clear from the record extract whether Reed testified as an expert witness.

tion with the special exception and mining permit. Reed testified extensively regarding the work he and other members of his firm did to effectuate the transfer of the mining permit and to prevent the revocation of the special exception. Like Deckelbaum, Reed testified that his firm billed Zachair by the hour and that the rates charged were "[i]n accordance with the market rate at the time." He stated that the total bill was approximately $215,000.00, with approximately $89,000.00 billed for the mining work and $115,000.00 billed for the special exception work.[15]

It is thus apparent that, although Zachair did not provide the court with an hourly breakdown of the work done and the rates charged, it provided ample evidence as to the complex and lengthy nature of the services performed. On this evidence, the jury could—and did—properly infer, with reasonable certainty, that the fees charged were appropriate.

■■■■ We are unpersuaded by the contention of Driggs and TDC that, under Md. Rules 5–703, 5–704, and 5–705, Deckelbaum and Reed could not testify regarding their fees unless documentation was offered as well. Each of these rules leaves to the sound discretion of the trial judge any decision as to whether to permit testimony or to admit documentary evidence, and we perceive no abuse of discretion. Similarly without merit is the contention of Driggs and TDC that, under Md. Rule 5–1006, Deckelbaum should not have been permitted to use his prepared summary while testifying regarding his bill since Driggs and TDC were not afforded an opportunity to inspect and copy the summary prior to trial. As the trial court determined, Rule 5–1006 applies to summaries that are prepared for admission into evidence at trial. Deckelbaum used his summary merely to refresh his own memory while testifying.

Driggs and TDC vaguely suggest that Deckelbaum and Reed should not have been permitted to express opinions as to

---

**15.** That left approximately $11,000.00 of the total bill for other work, which Reed did not discuss.

the reasonableness of their fees. Again, we are unpersuaded. Driggs and TDC offer no argument in support of their argument, and the legal basis is therefore unclear.

As indicated *supra*, n. 13, Zachair apparently failed to reveal prior to trial that it intended to call Deckelbaum as an expert witness, and the court thus refused to allow Deckelbaum to testify as an expert regarding anything other than his fees. Driggs and TDC do not inform us, and the record extract does not reveal, whether this same ruling applied to Reed. Driggs and TDC do not allege on appeal that the ruling as to the scope of Deckelbaum's testimony was erroneous, and any such contention would be unavailing. "[T]he appropriate sanction for a discovery ... violation is largely discretionary with the trial court, and the more draconian sanctions, of dismissing a claim or precluding the evidence necessary to support the claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice, either to a party or to the court." *Admiral Mortgage, Inc.*, 357 Md. at 545, 745 A.2d 1026. There is no suggestion that Driggs and TDC were prejudiced by the discovery violation. The record extract makes clear that they were aware from the start of Zachair's suit that Zachair was seeking to recover its attorney fees, and there is no reason to believe that they did not have sufficient opportunity to prepare a defense.

Driggs and TDC direct us to no authority that would suggest that expert testimony is necessary to establish that attorney fees are reasonable, and we are aware of no such authority. Nor are we aware of any authority that would suggest that an attorney may not be certified as an expert, as was Deckelbaum and possibly Reed, in a case involving the reasonableness of the attorney's own fees. *See generally* Md. Rule 5–702. Even a lay witness may offer an opinion on an ultimate issue of fact, such as the reasonableness of fees, if the opinion is rationally based on the perception of the witness and helpful to the determination of the trier of fact. *See generally* Md. Rule 5–701, 5–704(a). The record makes clear

that the opinions of Deckelbaum and Reed were indeed rationally based and helpful to the jury.

## IV

### Tortious Interference

Finally, TDC argues that the trial court erred by failing to grant the motion for judgment notwithstanding the verdict as to the count against it for tortious interference with contractual or economic relations, in that the evidence established that "TDC was out of the property on March 29, 1995, before the date the tortious interference allegedly began, and TDC did not initiate any of the acts allegedly constituting tortious interference." [16]   TDC further argues that, even if tortious interference on its part was established, the award of $275,000.00 was excessive.

Zachair alleged in its complaint that the various defendants, including Driggs and TDC, "interfer[ed] with the renewal of the Special Exception permit" and "refus[ed] to transfer the Mining Permit to Zachair [or its mining vendor]." Zachair posited that these acts, as well as others, tortiously interfered with its contractual or business relations with its mining vendor by preventing the mining vendor from mining Hyde Field for an eight month period, from June of 1995 until February of 1996. A review of the testimony presented at trial reflects that Zachair supported its claim.

While the evidence is somewhat unclear, it does indeed appear that the efforts to block the transfer of the mining permit were done in Southern's name and the efforts to revoke the special exception were done in the name of the LP. As the mining vendor for the LP, TDC was an entity that stood to gain, however, if the efforts were successful and Zachair was blocked from taking over Hyde Field. Southern,

---

**16.** Driggs does not join in this argument on appeal. At trial, Driggs admitted that, through Southern, he sought to renew the mining permit long after Hyde Field was sold at auction to Zachair and, through the LP, he sought to have the special exception withdrawn.

which was the mining vendor prior to TDC and which allowed TDC to use its mining permit, refused to permit Zachair to use the permit and attempted to block any transfer to Zachair. There is no dispute that Southern had nothing to gain from its actions, as it had ceased operations before Zachair purchased Hyde Field.

On this evidence alone, the jury could infer that TDC orchestrated the efforts.[17]   More evidence was offered through attorney Jeffrey Frost, however. · Frost testified that "the Driggs Corporation was paying for services of outside counsel to fight in adversary proceedings against Zachair both in the Circuit Court for Prince George's County as well as before some administrative bodies and also the Circuit Court of [sic] Baltimore City." While Frost stated that he had "no firsthand knowledge" of who paid for the litigation over the mining

---

17.  We recognize that the jury determined that TDC did not conspire against Zachair.   Zachair does not argue on appeal that the verdicts were therefore fatally inconsistent, and any such argument would have been unavailing.   Assuming *arguendo* that the verdicts were inconsistent, this Court explained in *Eagle–Picher Indus., Inc. v. Balbos*, 84 Md.App. 10, 35, 578 A.2d 228 (1990), *aff'd in part and rev'd in part on other grounds*, 326 Md. 179, 604 A.2d 445 (1992), that in civil as well as criminal cases

> [i]nconsistent verdicts generally are not sufficient grounds for an appellate court to reverse a jury's verdict. . . . "That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible.   But verdicts cannot be upset by speculation or inquiry into such matters." . . .

(Citations omitted.)   We further explained:

> . . . [W]e are reluctant "to interfere with the results of unknown jury interplay" at least without proof of "actual irregularity."   . . . We recognize that inconsistency may be the product of lenity, mistake, or a compromise to reach unanimity.   The continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it. . . .

*Id.* at 36, 578 A.2d 228 (citations omitted).   *See also Adams v. Owens–Illinois, Inc.*, 119 Md.App. 395, 408, 705 A.2d 58 (1998) ("Although irreconcilably defective verdicts may be subject to rejection, inconsistent verdicts generally are not").   *Compare S & R, Inc. v. Nails*, 85 Md.App. 570, 590, 584 A.2d 722 (1991) ("Where the answer to one of the questions in a special verdict form would require a verdict in favor of the plaintiff and an answer to another would require a verdict in favor of the defendant, the verdict is irreconcilably defective"), *vacated in part on other grounds*, 334 Md. 398, 639 A.2d 660 (1994).

permit, that litigation was the only litigation discussed at trial which began before an administrative body—the Bureau of Mines of the Maryland Department of the Environment—and was appealed to the Circuit Court for Baltimore City. The litigation concerning the special exception also began before an administrative body—a zoning hearing examiner for the Prince George's County Council sitting as the District Council.

TDC's contention that Zachair failed to prove that the tortious interference caused $275,000.00 in damages is without merit as well. Zachair presented evidence that established that its contract with its mining vendor required the mining vendor, under ordinary circumstances, to mine at least 500,000 tons of material per year. For the year during which the tortious interference occurred, the vendor was to pay Zachair $0.55 per ton. As TDC argues, the vendor would have been required to pay Zachair $275,000.00 had it mined the minimum 500,000 tons over the full year. From this, TDC concludes that, because the tortious interference occurred for only eight months, the $275,000.00 award was excessive. Using TDC's reasoning, Zachair would have been entitled to only $183,-333.32.

To the contrary, the 500,000 figure was only a minimum. As explained *supra,* at 427–31, there was evidence that more than twice that amount could be—and at times was—mined from Hyde Field. Given that evidence, the award of $275,000.00 was reasonable. *See generally M & R Contractors & Builders, Inc.,* 215 Md. at 348–49, 138 A.2d 350 (regarding certainty with which damages must be proven).

JUDGMENT AFFIRMED; COSTS TO BE PAID ¼ BY APPELLANT/CROSS APPELLEE AND ¾ BY APPELLEE/CROSS APPELLANT.